IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 18, 2025

**STATE OF TENNESSEE v. GERALD TYSHAWN HENRY**

**Appeal from the Criminal Court for Knox County**
**No. 115686   G. Scott Green, Judge**
_____

**No. E2024-01548-CCA-R3-CD**
_____

The Defendant, Gerald Tyshawn Henry, was convicted by a Knox County jury of second degree murder and various other gun-related crimes, for which he received an effective sentence of fifty years in confinement. In this appeal, the sole issue presented for our review is whether the evidence is sufficient to sustain the Defendant's conviction of second degree murder. Upon our review, we affirm.

**Tenn R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, P.J. and MATTHEW J. WILSON, J., joined.

Gerald L. Gulley, Jr., Knoxville, Tennessee (on appeal); Julia Anna Trant, Knoxville, Tennessee (at trial), for the appellant, Gerald Tyshawn Henry.

Jonathan Skrmetti, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Charme P. Allen, District Attorney General; and Nate Olge and Kaitlyn Nussbaum, Assistant District Attorneys General for the appellee, State of Tennessee.

**OPINION**

The following proof was adduced at the Defendant's two-day jury trial, which occurred February 22-23, 2022.

Destiny Dozard Ellison, the victim's niece, testified that the victim, Jerry Dean Holt, was forty years old on April 30, 2019. She identified a photograph of the victim, which was admitted into evidence.

Michael Mays, the keeper of records for Knox County Emergency Communications District 911, testified regarding one compact disc (CD), which contained five 911 calls that were made on April 30, 2019, the day of the offense. The CD and the computer aided

dispatch (CAD) written report were admitted into evidence as exhibits. One of the callers described the shooter as a black male, approximately six feet two or six feet three inches tall and wearing a white T-shirt.

William Steinke, a military veteran, testified and admitted that he had previously been convicted of a felony. He said that on the day of the offense he was passing out water from his car to the homeless in the area of KARM and Salvation Army, toward Depot Street. As he entered the left lane approaching a stop light, he heard some "commotion" near a dumpster between two gentlemen who were gesturing back and forth between each other. He described where he was on a map, which was admitted into evidence. He further stated

> I heard commotion as I was still moving down that, that lane. I slowed down knowing I had a red light. There was nobody in front of me, and as I started looking over my shoulder I saw a large, tall, athletic black man, white T-shirt and blue jeans and a mid-size, heavy set white guy and they were gesturing back and forth.
>
> And before I even came to a compete stop, I heard gunfire; five shots, bam, bam, bam, bam and I know the sound of gunshots. And the white man stumbled back.
>
> The tall, athletic black man, he had his hand up I mean I couldn't identify from that far away if it was a pistol or something else, but I know the sound of a pistol and there wouldn't have been any other reason he would be just raising one hand . . . . I saw the black man head between those buildings and the white man was coming towards my car stumbling, falling down. He eventually wound up on the curb over here and several people came to him[.]

Steinke said that as the white man stumbled and ran away from the black man, he could still hear gunfire. He agreed that although the two men were initially facing each other during the verbal argument, the victim was running away from the shooter when Steinke heard gunfire. He spoke with police when they arrived on the scene and later went to the police station where he participated in a photographic lineup. He did not identify the Defendant as the shooter during the first photographic lineup, and he explained that he was only 60% or 70% sure of the individual he selected. However, on the next day, he participated in another photographic lineup and said, "it was very clear who the shooter was" based on the Defendant's broad shoulders and height. He also identified the Defendant in court as the shooter on the day of the offense.

On cross-examination, Steinke characterized the commotion he heard as "yelling[.]" He repeated that the two men were being aggressive toward each other. He agreed that he did not observe what occurred prior to the commotion and that he did not see the Defendant with a gun in his hand. He also did not know whether the victim had a gun in his hands.

Raymond Persaud, the owner of a market and deli at the intersection of Broadway and Depot Street, testified that his store had outside camera surveillance which faced the lot where the incident occurred. Upon police request, he provided a copy of the video taken from the date of the offense, which was admitted into evidence. The video, a little over five minutes in duration, does not have sound. It depicts the shooting; however, it does not clearly show the identity of the shooter. The shooter, a black male, can be seen wearing a white, sleeveless type of T-shirt and dark pants.

Lieutenant Tracy Hunter of the Knoxville Police Department testified that she was the supervisor of the forensic unit at the time of the offense. Upon her arrival, the victim had been transported from the crime scene. She took photographs of the scene, which were admitted into evidence. One of the photographs taken near the dumpster area showed a clear plastic bag containing a white substance. The only items removed from the victim's body by the medical examiner when the victim was taken into custody included a green cigarette lighter, a black, folded pocket-knife, and a handwritten note on yellow paper. No gun was recovered from the victim's personal belongings. On cross-examination, she agreed that the victim's body had been removed before she arrived and that she could not be certain of what was on the victim's body before the shooting.

Investigator Robert Cook of the Knoxville Police Department's Violent Crime Unit testified that he responded to the scene on the day of the offense. The victim's body had already been transported from the scene. He agreed that no shell casings were recovered from the scene. Eventually, the Defendant's "name came up as a suspect." Investigator Cook explained that after taking the statement of William Steinke, he took the statement of the victim's brother, Tommy Holt, who was standing next to the victim when the victim was shot. The victim's brother provided Investigator Cook with a "full account" of what happened and identified the Defendant by his street name of "Brother Ellison" as a suspect. After taking Holt's statement, Investigator Cook showed Steinke the second photographic lineup during which Steinke identified the Defendant as the shooter.

Investigator Cook explained that he attempted to locate the victim's brother, an apparent drug user, for trial; however, he had been unsuccessful. The day after the shooting, Investigator Cook recovered the video from the market. As the video played for the jury, at the 4:25 mark, Investigator Cook identified the victim and the Defendant near the dumpster. Investigator Cook stated the video was helpful to the investigation because it showed where and how the victim had been shot. He identified a "freeze-frame"

photograph taken from the video showing the victim turning to run and the Defendant pointing a gun at him. After the interviews and reviewing the video, Investigator Cook returned to the crime scene. He eventually learned that the Defendant had discarded his white T-shirt behind a building near the crime scene. Investigator Cook located the T-shirt, which was admitted into evidence. A warrant was later issued for the Defendant, and he was arrested on May 3.

The Defendant provided a recorded statement to Investigator Cook concerning the shooting, which was admitted into evidence. The recording showed that the Defendant was advised of and waived his Miranda rights before speaking with Investigator Cook. The Defendant told Investigator Cook, in relevant part, that he had been in the area of the crime scene on the day of the offense talking with friends. He observed the victim, who he did not know, "beating" on another individual named "Woody." The Defendant said the victim "pulled a gun out [on Woody] and . . . then he put it back [in his hoodie]." He said the victim turned to him and started "running off at the mouth" with his hands in his hoodie the whole time. The Defendant said the victim was being "disrespectful," and the Defendant did not understand why because he had never met the victim before. The Defendant said, "I just pulled my gun and I shot, you feel me." The Defendant explained that he had been through some "sh**[,]" and he had been shot before, so he "shot. Boom." He agreed that he and the victim did not fight and the victim did not "swing" at him. The Defendant felt threatened by the victim because his hands were in his pockets. The Defendant said the victim acted as if he was going to pull the gun out and the Defendant observed the handle of the gun.

After the recorded statement was played for the jury, Investigator Cook reviewed the video from the market and identified a black car in the left turning lane traveling in a southern direction as belonging to William Steinke. Investigator Cook said his review of the market video did not show the victim pulling out a weapon and it did not reveal anyone taking a weapon from the victim's body.

Darinka Mileusnic Polchan, the Chief Medical Examiner for Knox and Anderson County, testified regarding the autopsy report of the victim in this case. The doctor who conducted the victim's autopsy had retired, and Dr. Polchan reviewed the report, confirmed the findings, and explained them to the jury. She said the victim's cause of death was a gunshot wound to his back that involved chest organs, and the manner of death was homicide. No bullet was recovered from the victim's body because the gunshot was "through and through" or entered the left back and exited the right front chest. The autopsy report was admitted as an exhibit at trial. Several photographs and a diagram of the victim's injuries were also admitted as exhibits to show the bullet trajectory, the lack of soot or gunpowder residue, and the extent of the victim's injury in this case. A toxicology report examining the victim's blood, eye fluid, and urine revealed a blood alcohol level of

.007 grams percent or just below the legal limit, 0.42 micrograms per milliliter of methamphetamine and the breakdown product of amphetamine, and 10.9 grams per milliliter of fentanyl. On cross-examination, she confirmed that the bullet trajectory in this case was upper shoulder to the lower chest. She explained that the bullet trajectory would not necessarily be "straight" if the victim was turned away from the shooter. She said the bullet trajectory would depend on various factors including any movement of and the height of the shooter and decedent. She confirmed that the toxicology report noted the presence of cocaine in the victim's urine.

Sheila Meltabarger, an employee of the Knox County Criminal Court Clerk's Office, testified as the keeper of records of criminal convictions in that office. She identified a certified judgment of conviction, admitted as an exhibit, showing that the Defendant had been previously convicted of possession with intent to sell cocaine less than .5 grams, a Class C felony, on November 2, 2007.

As relevant to the issues presented in this appeal, the jury convicted the Defendant as charged of second degree murder. On May 13, 2022, the trial court imposed an effective sentence of fifty years to be served in confinement. On June 30, 2022, the trial court entered an order via minute entry to reflect that the Defendant had not filed a timely motion for new trial and that his convictions were therefore final. On July 10, 2023, an order was entered appointing new counsel for the Defendant "for the purpose of motion for new trial."[1] On November 14, 2023, a hearing was conducted by the trial court to discuss the status of the Defendant's case and an order via minute entry was entered denying the Defendant's motion for new trial. At this hearing, the trial court inquired whether a petition for post-conviction relief had been filed, and trial counsel said that it had. Trial counsel further noted that the trial court had granted a delayed appeal and held all other post-conviction issues in abeyance.

On February 5, 2024, a written order was entered noting that the Defendant's motion for new trial "came to be heard on February 2, 2024[,]" and that said motion was denied. On October 10, 2024, the Defendant filed a motion to allow his late-filed notice of appeal in this court. In his motion, defense counsel explained that he represented the Defendant in another case (no. 123509), in which he had filed a petition for post-conviction relief seeking a delayed appeal and for the trial court to hold the matter in abeyance pending the determination of the motion for new trial in the instant case. Defense counsel alleged that the motion for delayed appeal was granted orally by the trial court; however, no written order was entered. On October 15, 2024, this court entered an order waiving the timely

---

[1] The original trial judge was appointed to this court, and all subsequent hearings were conducted by the successor trial judge.

filing of the notice of appeal in the interest of justice. This case is now properly before this court for review.

## ANALYSIS

The Defendant contends the evidence is insufficient to support his second degree murder conviction because it did not establish beyond a reasonable doubt that he was aware that shooting the victim was reasonably certain to cause the victim's death. The Defendant argues the evidence was consistent with voluntary manslaughter and showed that he acted in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner. The State argues the proof was sufficient to support the Defendant's conviction. We agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing Majors, 318 S.W.3d at 857).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Dorantes, 331 S.W.3d at 379 (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). An appellate court "neither re-weighs the evidence nor

substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

The Defendant asserts that he should have been convicted of voluntary manslaughter rather than second degree murder. Second degree murder is defined as "[a] knowing killing of another[.]" T.C.A. §39-13-210(a)(1). It is well established that second degree murder is a result-of-conduct offense. State v. Brown, 311 S.W.3d 422, 432 (Tenn. 2010); Page, 81 S.W.3d at 787. Therefore, as pertinent in this case, a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b). Whether a defendant acts knowingly in killing another is a question of fact for the jury. Brown, 311 S.W.3d at 432; State v. Inlow, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000). On the other hand, voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a).

Although the Defendant claims that the evidence presented at trial established adequate provocation, the proof, when viewed in a light most favorable to the State, shows that he knowingly killed the victim in this case. William Steinke, a military veteran, observed the two men arguing with each other in an aggressive manner. He observed the Defendant with something in his hand and immediately thereafter heard gunfire. As the victim turned and ran toward Steinke's direction, Steinke heard additional gunfire, which was consistent with the victim being shot in the back. The Defendant admitted to police that he and the victim were involved in a verbal altercation and that the victim did not swing at him, and they were not engaged in a physical fight. The Defendant also conceded that the victim did not pull a gun on the Defendant before the Defendant shot him. Although the Defendant insisted the victim had a gun that he had displayed while beating another individual immediately preceding the shooting, the video of the shooting does not show the victim with a gun, and it does not show anyone attempting to remove a gun from the body of the victim after the shooting. Finally, the medical examiner confirmed that the victim sustained a fatal gunshot wound with the bullet entering his back and exiting his right chest area. Based on all of this evidence, a rational jury could have found beyond a reasonable doubt that the Defendant committed a knowing killing rather than a killing due to adequate provocation. See Williams, 38 S.W.3d at 539 (stating that the jury's decision to reject the notion of adequate provocation was within its prerogative); State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995) ("Whether the acts constitute a 'knowing killing' (second degree murder) or a killing due to 'adequate provocation' (voluntary manslaughter) is a question for the jury."). Accordingly, we conclude that there was sufficient evidence to sustain the Defendant's conviction for second degree murder. The Defendant is not entitled to relief.

## CONCLUSION

Based on the above reasoning and authority, we affirm the judgment of the trial court.

s/ Camille R. McMullen_____
CAMILLE R. MCMULLEN, JUDGE